# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **KENDALL CLARKE, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 16-0572-WS-M** |
| | ) |
| **TANNIN, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the Court on the defendants' motions for summary judgment. (Docs. 111-16). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 111-16, 120-30, 132), and the motions are ripe for resolution. After careful consideration, the Court concludes the motions are due to be granted in part and denied in part.

## BACKGROUND

The remaining defendants are Tannin, Inc. ("Tannin") and George Gounares, the owner of Tannin.[1] The remaining plaintiffs[2] are five couples and two individuals,[3] all purchasers of property in the development known as the Village of Tannin ("the Village"). The Village lies just north of, and adjacent to, Highway 182 in Orange Beach, Alabama. The Gulf of Mexico ("the Gulf") is

---

[1] All other defendants have been dismissed on the parties' joint stipulations. (Docs. 80, 96).

[2] Two plaintiffs have been dismissed on the parties' joint stipulation. (Doc. 108).

[3] The remaining plaintiffs are: Kendall Clarke; José and Jill Rivera; Austin and Lee Boyd; Gary and Anna Schulte; Michael Gray and Sue Ellen Johnston ("the Grays"); Jimmy and Kym Black; and Daniel Johnson.

south of Highway 182.  According to the complaint, (Doc. 1), the defendants represented to the plaintiffs that, by purchasing land in the Village, they would have deeded access to the Gulf via a 41-foot-wide strip of land ("the Parcel") extending from the south side of Highway 182 to the Gulf.  These representations were made repeatedly from 1989 to 2015, during which time the plaintiffs enjoyed unfettered beach access via the Parcel, including vehicular access.  In July 2015, the defendants placed a locked gate across the northern end of the Parcel and thereafter limited the plaintiffs' beach access to foot traffic.  When Village property owners complained, the defendants responded that they (the defendants) owned the Parcel, that no Village property owner had been conveyed deeded access to the Parcel, and that, prior to a May 2015 Grant of Right to Use Land ("the Grant"), the defendants had merely permitted owners to use the Parcel for beach access.  The Grant purported to vest the Village of Tannin Association ("the Association") with a right of access to a five-foot width of the Parcel extending the full length of the Parcel.

The plaintiffs "bring this litigation to acquire the access rights they were promised, and to recover money damages for the Tannin Defendants' false and misleading sales practices."  (Doc. 1 at 5).  The complaint includes six causes of action:  (1) Interstate Land Sales Full Disclosure Act ("ILSA"); (2) declaratory judgment; (3) easement by prescription; (4) fraud; (5) breach of warranty; and (6) breach of fiduciary duty.  The defendants seek summary judgment as to all claims.[4]


**DISCUSSION**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[4] The defendants have filed separate sets of briefs.  However, Gounares relies principally on Tannin's briefing as to Counts One through Four, and he is not a defendant under Count Five.  (Doc. 1 at 17).  The Court therefore references Gounares's briefs primarily with respect to Count Six, as to which he is the only defendant.

Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). "Therefore, the plaintiff's version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the defendants and not in tension with the plaintiff's version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[5] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014). The Court accordingly limits its review to those arguments the parties have expressly advanced.

The plaintiffs identify Counts Two, Three and Five as designed to establish that the defendants have no legal authority to restrict their beach access, with

---

[5] Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record …."); *id*. Rule 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record …." *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotes omitted).

Counts One, Four and Six arguing for relief in the event the defendants do possess such authority. (Doc. 120 at 2). The Court therefore addresses first the claims challenging the defendants' ability to restrict the plaintiffs' use of the Parcel.

It is uncontroverted that the owner of record of the Parcel has at all relevant times been Tannin. It is also uncontroverted that the only relevant transfer of record of any interest in the Parcel is the May 2015 Grant from Tannin to the Association, which is limited to a five-foot swath. The plaintiffs nevertheless maintain that they possess a legally protected property interest in the entirety of the Parcel, which interest precludes the defendants from cutting off their vehicular access to the Parcel.

## I. Count Two – Declaratory Judgment.

The plaintiffs base their demand for declaratory relief on three legal theories: common-law dedication, dedication by estoppel, and "scheme of development." (Doc. 1 at 15; Doc. 121 at 1). As discussed below, the defendants are entitled to summary judgment as to all three theories and thus as to Count Two *in toto*.

### A. Common-Law Dedication.

"A 'dedication' is a donation or appropriation of property to the public use by the owner." *Ritchey v. Dalgo*, 514 So. 2d 808, 810 (Ala. 1987) (internal quotes omitted). Common-law dedication "is accomplished when there have been acts which evidence an unequivocal *intent* by the owner to dedicate the property to a public use *and* an *acceptance* by the members of the public of the property for that public use." *Id*. (emphasis in original).

"The public is a necessary party to any dedication, there being no such thing as a dedication to an individual." *Ritchey*, 514 So. 2d at 810 (internal quotes omitted). Indeed, and as the plaintiffs concede, "there is no such thing as a dedication to … a limited group of persons." (Doc. 121 at 4). Rather, a dedication

"must be for the benefit of the public, and not for any particular part of it."
*Stringer Realty Co. v. City of Gadsden*, 53 So. 2d 617, 619 (Ala. 1951) (internal
quotes omitted). That is, "the essence of a dedication to public uses is that it shall
be for the use of the public *at large*." *Id*. (emphasis added, internal quotes
omitted). Again the plaintiffs concur, acknowledging that dedication must be to
"the general public." (Doc. 121 at 4).

Alabama cases have repeatedly emphasized that dedication cannot work in
favor of a select subset of the public at large, such as those who purchase nearby
property from a common owner. According to *Stringer Realty*, "a grant by the
owner of a private right of way over his lands to buyers of different parcels of the
same to furnish them with convenient access to the street is no dedication to public
use." 53 So. 2d at 619 (internal quotes omitted). According to *Trustees of
Howard College v. McNabb*, 263 So. 2d 664 (Ala. 1972), a valid dedication of
land as a public park or parkway "must be for the benefit of the public at large,
and open for the use and enjoyment of everyone, rather than for the use of those
few individuals who own the adjoining property," such that "the private nature of
the alleged rights granted [to adjoining landowners only] precludes a finding that
this property has been dedicated as a public park." *Id*. at 671-72. And according
to *Garland v. Clark*, 88 So. 2d 367 (Ala. 1956), there was no dedication to the
public of a parking area adjoining a non-public, church cemetery when only those
owning cemetery lots or with other permission to use a cemetery lot used the
parking area. *Id*. at 370-71; *accord Ledlow v. City of Pell City*, 497 So. 2d 86, 88
(Ala. 1986) ("The dedication of property as a public cemetery requires an
intention to devote the property to the public at large ….") (citing *Garland*).

As the defendants note, (Doc. 112 at 2-4), the plaintiffs have no evidence
that the defendants intended to open the Parcel to use by the public at large. Their
evidence is, at best, that the defendants authorized only the plaintiffs, other Village
property owners, and a select few others to use the Parcel. There is not a shred of
evidence that the defendants intended to, or did, authorize the public at large to use

the Parcel.  On the contrary, the plaintiffs agree that the defendants took pains to prevent the public at large from using the Parcel, keeping it fenced on both sides and with signs at the northern (highway) end proclaiming the Parcel to be "private property" for use by Tannin or the Village only and at the southern (beach) end announcing "private beach."  (Doc. 111-17 at 10; Doc. 111-21 at 23; Doc. 111-22 at 8; Doc. 112-3; Doc. 112-5).  As the cases discussed above reflect, such evidence is patently insufficient to support a common-law dedication.  *See Stringer Realty*, 53 So. 2d at 619 ("To describe a tract of land as 'Private Park' appears to indicate the opposite of public use.").

The plaintiffs note that the plat of the Village ("the Plat") depicts the Parcel and labels it as "Beach Access."  (Doc. 111-31 at 1, 3).  This language, they say, "correspond[s] with" the phrases, "Sand Beach" and "community beach" used on the plats of the property at issue in *Ritchey*, where the Court found the evidence sufficient to support a common-law dedication.  (Doc. 121 at 6).  The *Ritchey* Court, however, did not rely on the term "sand beach" as indicating an intent to dedicate the area to the public at large.  514 So. 2d at 813.  While the Court did rely on the "community beach" language, *id.*, that adjective on its face connotes access by the public.  In contrast, the term "beach access" does nothing to identify *who* has such access and, in the context of a plat of the Village, it could hardly be read to mean anything other than access by Village property owners.

This obvious conclusion is only bolstered by the plaintiffs' reliance on the language of the Village declaration ("the Declaration") for its "corresponding" statement, (Doc. 121 at 8), that "Tannin is near the Gulf of Mexico and has access to it."  (Doc. 111-30 at 5).  Reading the Declaration in conjunction with the Plat, as the plaintiffs demand, renders it inescapable that the "beach access" mentioned in the Plat is the "access" of "Tannin," not the public at large.

As noted, to sustain a common-law dedication, the evidence of the defendants' intent to dedicate the Parcel to the public at large must be "unequivocal."  This is not a low threshold.  "To establish a dedication, the

*clearest intention* on the part of the owner to that effect must be shown, and the evidence must be *clear and cogent*, and the acts of the owner relied on to establish a dedication must be unequivocal in their indication of the owner's intention to create a public right exclusive of his own." *Trustees*, 263 So. 2d at 670 (emphasis added, internal quotes omitted). The plaintiffs' evidence does not come close to meeting this demanding standard, and no properly functioning jury could find it satisfied.

### B. Dedication by Estoppel.

The plaintiffs quote from *Ritchey* regarding "the role of estoppel as that doctrine applies in common law dedication cases," and they conclude that, "[u]nder the facts as presented, Defendants should be estopped … from … restricting the Plaintiffs' use of the … Parcel." (Doc. 121 at 7). *Ritchey* did not apply an estoppel theory, and it explained neither how such an estoppel arises nor the relation of estoppel to dedication based on the owner's conduct as discussed in Part I.A. However, *Ritchey* quoted from *Sam Raine Construction Co. v. Lakeview Estates, Inc.*, 407 So. 2d 542 (Ala. 1981), which addresses these issues in more detail.

*Sam Raine* considered whether there was sufficient evidence to reach a jury that a particular road had become a public way. This can occur in any of three ways: a regular proceeding for that purpose, general use by the public for twenty years, or "by a dedication as such by the owner of the land the way crosses, with acceptance by the proper authorities." 407 So. 2d at 544. The evidence ruled out the first two possibilities, leaving the plaintiff to show a common-law dedication. *Id.* Citing *Trustees*, the Court acknowledged that, "to constitute a dedication at common law, there must of course be an intention of the owner to dedicate the property …." *Id*. at 548. The Court also acknowledged that "[t]he owner must *unequivocally* intend to create a public right exclusive of his own." *Id*. at 544 (emphasis added, internal quotes omitted).

The *Sam Raine* Court then identified common-law dedications as "either expressed or implied," with the latter "aris[ing] when the acts or conduct of the owner are deemed to intend a dedication to the public use, such an implication being founded on the doctrine of estoppel in pais rather than by estoppel in grant." *Id*. "Once the public accepts the dedication by its use of the land, the owner will be estopped to deny the dedication without a clear showing that his acts were erroneously construed as intending to dedicate." *Id*. at 544-45. As to what acts or conduct by the owner suffice to support an estoppel, the Court turned to a 1903 decision from Kentucky, which indicates that, "[i]f … the owner suffers the public to use the passway, knowing it is claiming it as a matter of right, the law presumes a dedication to the public, and presumes the dedicator's intention to be in accord with the public's use," regardless of "whether there has been in fact an actual dedication to the public." *Id*. at 545 (internal quotes omitted). The idea is that if the owner "suffer[s] the public generally to so use his land as a passway, under a notorious claim of right, for a great length of time," such that persons have paid an enhanced price for nearby property on the understanding the way is public, it would be unfair for the owner to disappoint their understanding. *Id*. (internal quotes omitted).

As far as the Court can determine, only *Ritchey* has cited *Sam Raine*'s discussion of estoppel, and *Ritchey* does not elucidate *Sam Raine*'s meaning or application. Nor have the parties done so. The Court finds *Sam Raine* to be subject to multiple interpretations, but neither of them assists the plaintiffs. If *Sam Raine* is a gloss on *Trustees* and the other cases discussed in Part I.A, then no estoppel arises unless the plaintiffs first demonstrate the defendants' unequivocal intent to dedicate the Parcel to the public at large. Because, as discussed above, the plaintiffs cannot do so, no estoppel to deny a dedication can arise.

The other possibility is that *Sam Raine* recognizes an additional method of showing a common-law dedication, one in which the owner's intent to dedicate his property to public use need not be shown unequivocally by his own acts and

conduct but can be presumed simply by his passive failure to respond to the public's open and notorious use of his property under a claim of right. The plaintiffs, however, identify no evidence that the general public has used the Parcel openly, notoriously and under a claim of right; on the contrary, they insist the Parcel has at all times been for the exclusive use of Village owners and a few select others. (Doc. 111-16 at 4-5, 7-8; Doc. 111-17 at 14-16; Doc. 111-19 at 13; Doc. 111-21 at 9, 18-19; Doc. 112-3).

Nor is there evidence of the defendants' passive acquiescence in any (undemonstrated) public use, as there was in *Sam Raine*. A jury issue was raised in *Sam Raine* based on: (1) the county's performance of maintenance work on the road in question; (2) the owner's failure to pay for a public water system installed along the road by a water and fire protection authority; (3) the owner's failure to ever stop anyone from freely traveling the road; and (4) the absence of any sign declaring the road to be private. 407 So. 2d at 545. The plaintiffs identify no evidence that anyone other than the defendants has maintained or improved the Parcel, and it is uncontroverted that only Tannin did so. (Doc. 111-39 at 2-3). It is further uncontroverted that the defendants fenced off both sides of the Parcel and posted signs at both ends warning the public that the Parcel was private. The plaintiffs make no assertion that the defendants have never affirmatively stopped any member of the general public from using the Parcel and, without proof (which they do not offer) that the general public routinely used the Parcel, it is difficult to see how a failure to post guards at the Parcel or to take other extreme measures could amount to passive acquiescence.

Finally, an estoppel under *Sam Raine* would require proof, not merely of unimpeded use of the Parcel by the public at large, but a resulting increase in surrounding property values based on the Parcel's availability to the general public. The plaintiffs do not even suggest that this has occurred.

As noted, the Court will not manufacture or support arguments on behalf of the litigants, and the plaintiffs' failure to support their conclusory invocation of estoppel places no burden on the Court to supply the deficiency.

### C. Scheme of Development.

According to the complaint, "when a subdivision is platted and a lot in the subdivision is conveyed with reference to that plat, any landowner in the subdivision has the right to enforce the scheme of development shown on the plat." (Doc. 1 at 15). The actual rule, as expressed by the cases on which the plaintiffs rely, is somewhat more limited.

"It is well settled … that where a person plats land and lays off lots according to such plat and makes sale of one or more of such lots with reference thereto, he irrevocably dedicates the land *designated thereon as streets, alleys, avenues, and highways* to the public for public uses …." *Whitten v. Ferster*, 384 So. 2d 88, 88 (Ala. 1980) (emphasis added, internal quotes omitted). Once this has occurred, "[e]very purchaser of a lot shown on the recorded map of the subdivision has the right, as against the dedicator of the streets and the purchasers of the other lots, to have the *designated scheme of public thoroughfares* maintained in its integrity, as it existed when he purchased the property, and all persons whosoever may use these public ways as the occasion requires." *Booth v. Montrose Cemetery Association*, 387 So. 2d 774, 777 (Ala. 1980) (emphasis added).

This line of cases represents a particular application of the rule that an owner's intent to dedicate land to the general public must be unequivocally manifested by his acts. *Booth*, 387 So. 2d at 777 n.1. Such an intention may be unequivocal when the owner records a plat that "designates" areas as "unrestricted" streets, as the plaintiffs' cited cases reflect. *Id*. at 777 & n.1; *Cottage Hill Land Corp. v. City of Mobile*, 443 So. 2d 1201, 1202 (Ala. 1983); *Whitten*, 384 So. 2d at 88; *Snead v. Tatum*, 25 So. 2d 162, 162 (Ala. 1946);

*Thetford v. Town of Cloverdale*, 115 So. 165, 167 (Ala. 1927); *Highland Realty Co. v. Avondale Land Co.*, 56 So. 716, 718 (Ala. 1911). The recorded Plat in this case, however, does not designate the Parcel as a street or other thoroughfare; instead, the Parcel is labeled blandly as "beach access." (Doc. 111-31 at 1, 3). The plaintiffs – who devote no argument to this section but simply quote from two cases and string cite others – do not address this inconvenient fact.

The Court is aware that an adequate designation may sometimes be shown "without the designation eo nomine of the space as a street, highway or alley" but "from the situation created by the relative location of blank spaces and lots or blocks and from the purpose to which the lots or blocks are expected to be devoted and from the lines and courses indicated by the map as they relate to lines of the subdivisions made." *East Birmingham Realty Co. v. Birmingham Machine & Foundry Co.*, 49 So. 448, 451 (Ala. 1909). While the plaintiffs included *East Birmingham Realty* in their string citation, they presented no argument based on it, or even an explanation of its relevance. (Doc. 121 at 12). The Court has and expresses no opinion whether *East Birmingham Realty* would have aided the plaintiffs had they articulated any argument drawn therefrom; as noted previously, the Court will not construct arguments on behalf of the parties that they have elected not to present themselves.[6]

## II. Count Three –Easement by Prescription.

"To establish an easement by prescription, the claimant must use the premises over which the easement is claimed for a period of twenty years or more, adversely to the owner of the premises, under claim of right, exclusive, continuous, and uninterrupted, with actual or presumptive knowledge of the

---

[6] Even could the plaintiffs show a dedication under this line of cases, they would not like the result. The plaintiffs stridently oppose any use of the Parcel by anyone but themselves and other Village owners, yet any dedication would by law run in favor of the public at large. *E.g., Booth*, 387 So. 2d at 777; *Snead*, 25 So. 2d at 163.

owner." *Bull v. Salsman*, 435 So. 2d 27, 29 (Ala. 1983). As the defendants point out, (Doc. 113 at 2), seven plaintiffs cannot satisfy the 20-year requirement.[7] The plaintiffs do not contest the point.

The parties agree that "permissively" is the antonym of "adversely," but they disagree who bears the burden regarding this element. The defendants quote *Bull* for the proposition that "[t]he presumption is that the use is permissive, and the claimant has the burden of proving that the use was adverse to the owner." 435 So. 2d at 29. The plaintiffs counter with *Thomas v. City of Rainsville*, 502 So. 2d 346 (Ala. 1987), for the proposition that "an open, defined roadway, through reclaimed land, in continuous use by the public as a highway without let or hindrance for a period of twenty years becomes a public highway by prescription," with the burden "then on the landowner to show the user was permissive only." *Id*. at 348 (internal quotes omitted).

As the defendants point out, (Doc. 128 at 2-3), the cause of action set forth in Count Three is expressly limited to "easement by prescription." (Doc. 1 at 15). Further, the relief sought is expressly limited to the establishment of an easement by prescription in favor of the plaintiffs only. (*Id*. at 16). As the defendants also point out, *Thomas* and the other cases on which the plaintiffs rely do not involve easement by prescription but dedication by prescription. 502 So. 2d at 347. As with other forms of dedication, dedication by prescription cannot run in favor of individuals but only in favor of the public at large. *Id*. ("general use by the public" for a sufficiently long and adverse period results in a "public highway by prescription"). The Court agrees with the defendants that the plaintiffs cannot by brief expand their complaint to encompass a claim for dedication by prescription. *E.g., Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) ("A plaintiff may not

---

[7] Johnson purchased his property in 2005. The Blacks purchased their property in 2006. The Boyds purchased their property in and after 2014. The Schultes purchased their property in 2015. (Docs. 111-6, 111-9 to -12).

amend her complaint through argument in a brief opposing summary judgment.") (internal quotes omitted).

The question remains whether the defendants have carried their threshold burden on motion for summary judgment of showing either that the plaintiffs' use of the Parcel was permissive or that the plaintiffs cannot prove otherwise. The Plat satisfies the defendants' burden by negating adverse use: in publicly identifying the Parcel as "beach access," the Plat unmistakably reflects the defendants' permission for the plaintiffs and other Village owners to use the Parcel for that purpose.

The plaintiffs offer no adequate response. Legally, they advance a presumption of adverse use, (Doc. 122 at 6-8), but the Court has demonstrated the presumption does not apply in this case. Factually, they direct the Court to "[t]he testimony of adverse use cited above," (*id*. at 8), but the deposition excerpts to which they cite directly refute the proposition when they address it at all. (*Id*. at 2-5).[8] Finally, they suggest the defendants have admitted they own no interest in the Parcel, such that they could not give permission to use the Parcel, such that the plaintiffs' use of the Parcel must have been adverse. (*Id*. at 8). If, however, the defendants have no interest in the Parcel, it is impossible for any plaintiff to obtain an easement by prescription. "Without having first determined who owned the driveway, the trial court could not have granted either party … an easement by prescription in the driveway, because in order to establish an easement by prescription, use of the disputed area must be adverse *to the owner* [and] with knowledge *of the owner*." *Coleman v. Kilpatrick*, 824 So. 2d 788, 791 (Ala. Civ. App. 2001) (emphasis in original); *accord Hanks v. Spann*, 990 So. 2d 399, 403 (Ala. Civ. App. 2008).

---

[8] Clarke has "always been allowed" by the defendants to use the Parcel. (Doc. 120-1 at 80). The defendants told José Rivera that he could drive his car down the Parcel to the beach. (*Id*. at 114).

Because the defendants have met their initial burden, and because the plaintiffs have failed to present any evidence that their use of the Parcel was adverse to the defendants (or, as to seven plaintiffs, that they used the Parcel for 20 years), the defendants are entitled to summary judgment as to Count Three.

## III. Count Five – Breach of Warranty.

Count Five alleges that Tannin "breached the warranties contained in each Plaintiff's deed to land within the Village of Tannin." (Doc. 1 at 17). On brief, the plaintiffs clarify that Count Five is based on breaches of the covenants of warranty and of quiet enjoyment. (Doc. 124 at 2).

"The covenant for quiet enjoyment and of warranty … are practically identical in operation; and whatever constitutes the breach of the one covenant, is a breach of the other. Either extends to all lawful, outstanding adverse claims upon the premises conveyed." *Prestwood v. McGowin*, 29 So. 386, 388 (Ala. 1900) (internal quotes omitted). Both covenants provide "an assurance against the consequences of a defective title, or of any disturbance in the enjoyment of the land conveyed …." *Keel v. Ikard*, 133 So. 906, 907 (Ala. 1931); *accord St. Paul Title Insurance Corp. v. Owen*, 452 So. 2d 482, 485 (Ala. 1984) (covenants of quiet enjoyment and warranty contained in deed "ran with the land purportedly conveyed by that instrument"); *Chicago, Mobile Development Co. v. G.C. Coggin Co.*, 66 So. 2d 151, 158 (Ala. 1953) (both covenants are to "defend the title conveyed").

As shown above, the warranties on which the plaintiffs rely extend only to the property "conveyed" by the plaintiffs' respective deeds. As the defendants note, (Doc. 115 at 2-3), the plaintiffs' deeds do not purport to transfer to them any interest in the Parcel. On the contrary, on its face each deed on which the plaintiffs rely conveys only a particular numbered lot within the Village.[9] The plaintiffs acknowledge that the deeds convey only particular lots, (Doc. 124 at 3-4,

---

[9] (Doc. 120-1 at 269, 273, 276, 280, 284, 288, 292, 296).

5), and they offer no explanation how this circumstance could not be fatal to their claim. As discussed above, it is.

## IV. Count One - ILSA.

The complaint alleges the defendants violated 15 U.S.C. § 1703(a). (Doc. 1 at 12). The plaintiffs' brief clarifies that the claim is based on Section 1703(a)(2). (Doc. 120 at 19-21). The defendants assert a number of arguments in opposition to this claim, but the Court finds two dispositive.

Section 1703(a)(2) prohibits a developer or agent, "with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title," from engaging in certain conduct. A cause of action for violation of Section 1703(a)(2) runs in favor only of "[a] purchaser or lessee" and only against "a developer or agent." 15 U.S.C. § 1709(a). A "purchaser" is defined as "an actual or prospective purchaser or lessee of any lot in a subdivision." *Id*. § 1701(10). Cases construing these provisions have concluded that a purchaser has a cause of action only if he or she purchased directly from the developer and not from a previous purchaser.[10] It is uncontroverted that the Blacks, the Boyds, the Schultes and Johnson purchased their properties from third parties, not from the defendants. (Docs. 111-6, -8 to -12).

The defendants presented this argument in their opening brief, (Doc. 111 at 18-19), and the plaintiffs offer no defense of these seven plaintiffs' ILSA claim. Instead, they suggest only that the Court may look to these plaintiffs' experience in determining whether the defendants violated ILSA with respect to the other five plaintiffs. (Doc. 120 at 24-25). As previously noted, the Court will not advance or support arguments the parties have declined to express themselves. Because

---

[10] *Gibbes v. Rose Hill Plantation Development Co.*, 794 F. Supp. 1327, 1333-34 (D.S.C. 1992); *Thompson v. Bank of America*, 2011 WL 13151658 at *7 (E.D.N.C. 2011); *Konopisos v. Phillips*, 226 S.E.2d 522, 524 (N.C. App. 1976).

these seven plaintiffs did not purchase lots from the defendants, the defendants are entitled to summary judgment as to their ILSA claim.

"It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails … with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title … to employ any device, scheme, or artifice to defraud [or] to obtain money or property by means of any untrue statement [or omission] of a material fact [or] to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser [or] to represent that" certain amenities will be provided or completed unless so stipulated in the contract. 15 U.S.C. § 1703(a).

The parties do not address what this unwieldy provision means, but the defendants reasonably assume it must require at least that they used interstate communications or transportation, or the mails, to market or promote the Village before a specific plaintiff purchased his or her lot. (Doc. 111 at 27). The plaintiffs express no disagreement with this proposition but instead insist there is evidence the defendants marketed and promoted the Village by such means. (Doc. 120 at 38).

Clarke purchased his lot in March 1990. (Doc. 111-1). The Grays purchased their lot in June 1990. (Doc. 111-2). The Riveras purchased their lot in June 1994. (Doc. 111-3).[11] The defendants offer the testimony of Gounares for the proposition that they did not use the mails or any interstate transportation or communications for sales or marketing purposes prior to these dates. Specifically, Gounares states that: he mailed no promotional, marketing or other material to

---

[11] The Riveras later purchased two additional lots, one of which they sold to the Blacks in November 2004 and the other of which they sold to Johnson in May 2005. (Docs. 111-5, -8, -11). Because the Riveras sold these lots over a decade before filing this lawsuit, the defendants conclude they are not part of this lawsuit. (Doc. 111 at 3). The plaintiffs express no disagreement with that conclusion, with which the Court concurs.

Clarke, the Grays, the Riveras or any other plaintiff (such materials were available only in the sales office); the only advertisements for the sale of lots in the Village were placed in Alabama publications targeted to Alabama residents; and Tannin first used a website in 2003. (Doc. 111-13 at 24-25; Doc. 111-39 at 1-2). The defendants' showing that they did not make use of the mails or interstate transportation or communications prior to the Riveras' purchase passes the burden to the plaintiffs to show a genuine issue as to this material fact.

The plaintiffs in response identify several circumstances that they believe satisfy the mails/interstate communications/transportation element of their claim: (1) an April 1990 *Birmingham News* article and contemporaneous advertisement therein; (2) the defendants' use of a Florida attorney to prepare the Declaration; (3) the subdivision's design by an architectural firm from Florida, which firm traveled the southeast in the course of their design work; (4) the defendants' passing out of brochures to visitors to the sales office; (5) mention of the development in several magazines; and (6) Tannin's 1987 mailing to the IRS of an application for an employer identification number. (Doc. 120 at 36-38).

The second, third and sixth items on the plaintiffs' list do not concern marketing and promotion of the Village (as they concede is required) but only its development. The fourth item involves only the hand-to-hand distribution of promotional material at a specific Alabama location. (Doc. 120-1 at 29).

Something clearly was published in the listed periodicals, (Doc. 120-1 at 213-16, 218-21), but the plaintiffs offer no evidence that it constituted marketing or promotional material. The published material clearly is not advertisement but rather articles discussing the Village (and perhaps other developments) using what appears to be – from the few isolated sentences and sentence fragments the plaintiffs offer – favorable language. The defendants no doubt were pleased by such publicity, but the plaintiffs do not explain how the articles could constitute marketing or promotional material any more than would a restaurant review in *Bon Apétit*. Nor do the plaintiffs explain how a third party's publication of a

favorable article could constitute the defendants' "use" of the mails or interstate communication. The situation might be different if the defendants wrote the articles or paid the publications to write and publish them, but the plaintiffs do not even suggest that this occurred, much less produce evidence of such a history. As previously noted, the Court will not devise or develop arguments the parties have declined to assert themselves.

The *Birmingham News* article, (Doc. 120-1 at 45-46), does not assist the plaintiffs for the same reasons the magazines discussed in the previous paragraph do not assist them.[12] Though informative and generally favorable, the article does not constitute an advertisement, and the plaintiffs offer no evidence that the article was written, or paid for, by the defendants.[13]

The *Birmingham News* advertisement, (Doc. 20-1 at 230), plainly constitutes marketing or promotional material, for the publication of which the defendants presumably paid. However, and as the defendants note, (Doc. 126 at 15), the plaintiffs offer no evidence that this edition (or any other) of the *Birmingham News* was mailed or traveled in interstate commerce. Nor do the plaintiffs ask the Court to take judicial notice of such mailing or travel. Instead, they simply assume the newspaper "would have" used the mails, (Doc. 120 at 37), but without evidence this is mere speculation, not reasonable inference. *See, e.g., Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986) ("[I]nferences based upon speculation are not reasonable.").

Because the plaintiffs have failed to show the existence of a genuine issue of fact as to whether the defendants made use of the mails, or of interstate communications or transportation, to market, promote or sell lots in the Village

---

[12] Because the *Birmingham News* article does not assist the plaintiffs, the defendants' motion to strike the article, (Doc. 131), is **denied as moot**.

[13] The article includes no by-line, but neither does an article on the same page addressing Florida's official state saltwater fishing rules.

prior to June 1994, the defendants are entitled to summary judgment as to the ILSA claim of Clarke, the Grays and the Riveras.

## V. Count Four - Fraud.

Count Four alleges that the defendants misrepresented to each Plaintiff that lots within Tannin had "deeded access" to the Gulf. (Doc. 1 at 16). In brief, the plaintiffs repeat that the defendants misrepresented that lots in the Village were conveyed with "deeded or vested rights of access." (Doc. 120 at 19).[14] The defendants raise several arguments in support of their motion for summary judgment, most asserted against varying subsets of the twelve plaintiffs.

### A. Statute of Frauds.

The defendants' only universal argument is that the plaintiffs' fraud claims are barred by Alabama's statute of frauds. (Doc. 114 at 5-7).

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
> …
> Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, … unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller.

Ala. Code § 8-9-2(5).

The plaintiffs do not claim a fee interest in the Parcel but rather a vested right to use the Parcel to access the beach. The Court agrees with the defendants, (Doc. 129 at 12), that the right the plaintiffs describe corresponds with an easement. An easement is an interest in land and thus subject to the statute of

---

[14] Neither side suggests that "vested" is a broader term than "deeded," so the Court employs the former term even though it is not used in the complaint.

frauds.  *Garrison v. Alabama Power Co*., 807 So. 2d 567, 572 (Ala. Civ. App. 2001).

The plaintiffs argue that the statute of frauds does not apply because their "fraud claims are not dependent on any contract with the Defendants." (Doc. 123 at 9).  As the defendants note, however, "an oral promise that is void by operation of the Statute of Frauds will not support an action against the promisor for promissory fraud." *Bruce v. Cole*, 854 So. 2d 47, 58 (Ala. 2003).  The plaintiffs do not deny that their fraud claim depends on oral promises by the defendants that they would have vested beach access via the Parcel; on the contrary, they repeatedly insist that the claim is based on such promises.[15]  Their claim is thus subject to the statute of frauds.

The parties disagree as to whether a writing adequate to satisfy the statute of frauds exists.  The Court need not resolve that dispute, because the defendants have not carried their threshold burden on motion for summary judgment of showing that the plaintiffs were not "put in possession" of the Parcel so as to obviate compliance with the statute of frauds.[16]  The defendants concede – indeed, they insist – that the plaintiffs at all times from purchase until July 2015 were able to, and did, freely use the entirety of the Parcel for beach access.  (Doc. 111 at 1).  The defendants posit that such use does not qualify as being put in possession, (Doc. 129 at 13), but they offer no authority or analysis in support of this less than obvious proposition.  Since an easement to cross another's property can by its nature be exercised only at times and not continuously, it is not clear what more could be required to satisfy the "put in possession" provision.  To the uncertain extent the defendants' argument is that the plaintiffs' use of the Parcel was merely

---

[15] "At the time each Plaintiff bought his or her lot within the Village of Tannin, the Tannin Defendants promised that all property would have deeded access to the Gulf of Mexico" via the Parcel.  (Doc. 1 at 5; *accord* Doc. 120 at 2, 19; Doc. 123 at 10).

[16] "[B]ecause the Statute of Frauds is an affirmative defense, …, the defendant invoking it bears the burden of proving that the contract meets the stated criteria of the statute." *Ex parte Ramsay*, 829 So. 2d 146, 154 (Ala. 2002).

permissive, they have not attempted to show that whether a plaintiff is put in possession depends on the defendant's intent rather than on the parties' actions.

### B. Statute of Limitations.

"A fraud action is subject to a two-year statute of limitations." *Liberty National Life Insurance Co. v. McAllister*, 675 So. 2d 1292, 1297 (Ala. 1995) (citing Ala. Code § 6-2-38). "However, the fraud claim accrues only when the plaintiff discovers the fraud or when the plaintiff, acting as a reasonable person, should have discovered the fraud." *Id*. (citing Ala. Code § 6-2-3).

All plaintiffs save the Schultes closed more than two years before this action was filed. The defendants argue that these plaintiffs discovered the alleged fraud, or reasonably should have discovered it, contemporaneously with the recording of their deeds, such that the limitations period as to them expired before suit was filed. Under Alabama law, the recording of a deed provides conclusive notice to the world of "everything that appears from the face of the instrument," and the deeds, they say, provided "constructive notice of the ownership" of the Parcel, such that these plaintiffs knew or should have known "the status of title" to the Parcel. (Doc. 114 at 5).

The defendants do not explain this assertion. In particular, they do not explain what it is about the deeds that reflects they held title to the Parcel. The deeds simply state that the grantors convey specified lots to the grantees. They do not mention the Parcel, much less identify the defendants as holding title to the Parcel; because nothing regarding such ownership "appears from the face of the instrument," the defendants' argument collapses.

The Court further agrees with the plaintiffs, (Doc. 123 at 8), that the defendants' argument would fail even if the deeds explicitly stated that the defendants held title to the Parcel. The plaintiffs' claim is that they were told they would have vested beach access via the Parcel. The very nature of an easement is that the owner of property grants to a non-owner certain rights of access to and/or

through his property; there is simply nothing inconsistent between title resting in the defendants and access rights resting in the plaintiffs.[17]

In the same vein, the defendants argue that Clarke, the Grays and the Riveras claim the defendants misrepresented that the Association owned the Parcel and that, once these plaintiffs discovered the Association did not own the Parcel, they were, or should have been, aware of the fraud such that the limitations period began to run. (Doc. 111 at 22-23; Doc. 114 at 2-3). The analysis, however, is a bit more complicated.

The defendants do not cite any evidence for the proposition that Clarke was told, or believed, that the Association owned the Parcel; the representations to which they cite are that he would have "deeded access," not that the Association owned the Parcel. In any event, the defendants identify no evidence that Clarke understood, or should have understood, that he could not have deeded access unless the Association owned the Parcel. As discussed above, there is nothing inconsistent between Tannin owning the Parcel and the plaintiffs having vested access rights carved out from that ownership.

In the testimony on which the defendants rely, José Rivera stated he was shown the Parcel and told, "it belongs to the subdivision." He concluded from this that it was "[m]ore likely" that the Association owned it. By 2005, he understood that either the Association or Tannin owned the Parcel, but he assumed that Tannin meant the Association. (Doc. 111-19 at 3-4,10). This testimony shows that Rivera did not consider the Association's ownership of the Parcel to be an essential predicate to his beach access rights. It shows further that Rivera did not see any difference in ownership by Tannin and ownership by the Association.

The Grays' situation is similar. Michael Gray was told he would receive deeded beach access, which he understood to mean the Association owned "it."

_____

[17] Although unnecessary to the result, Clarke voiced exactly this understanding. (Doc. 111-16 at 41).

23

(He did not clarify whether "it" referred to the Parcel or the access rights.) He later heard at an annual meeting that Tannin owned the Parcel, with Gounares responding that this was just an oversight and that the residents actually owned the total area. (Doc. 111-17 at 6-7, 9). Michael, like José, did not perceive a significant difference between Tannin and the Association. (Doc 120-1 at 98).

It might or might not be possible to construct and support a viable limitations argument from the threads the defendants offer. It might, for example, be possible to show that any reasonable person would know, or be charged with knowledge, that Tannin and the Association were different entities with mutually exclusive rights and interests. It might also be possible to show that the plaintiffs, or some of them, understood or should have understood (even though it is a false proposition) that they could have no vested beach access unless the Association owned fee title to the Parcel. The Court neither has nor expresses any opinion on that score; for present purposes, it is enough to conclude that the defendants by their cursory treatment have not met their burden on motion for summary judgment of establishing the factual and legal points necessary to support their limitations defense.

With respect to Clarke only, the defendants raise three additional arguments regarding the statute of limitations. They first argue Clarke should have discovered in 1990 that he had no deeded beach access, because the deed to his lot contained no reference to the Parcel. (Doc. 111 at 23). Clarke testified that, as a layman, he took "deeded access" to mean "we had a deed *somewhere* to the access," (Doc. 111-16 at 6 (emphasis added)), and the defendants have not shown that belief to be unreasonable. The deed to the lot would be one "somewhere" a deed to beach access could reside, but it is not the only one, and property interests short of fee title are routinely transferred by documents other than deeds conveying title.

Second, the defendants argue Clarke should have discovered he had no deeded beach access in 1991. (Doc. 111 at 22). Based on certain encounters,

Clarke had grown distrustful of Gounares and so reviewed his deed; finding no reference to deeded beach access there, Clarke went to the county courthouse, where an employee clerk helped him locate the recorded documents and told him they showed he did have deeded beach access. The episode put Clarke's mind at ease for many years. (Doc. 111-16 at 11-14, 23-24, 43). The defendants find it outrageous that a layman would rely on a courthouse employee's assurance – after reviewing the recorded documents – that he had deeded beach access, but their indignation is no substitute for legal authority or cogent explanation why a "reasonable person should have discovered the fraud" in 1991 despite such apparently informed assurances. Simply labeling the employee's error a "misrepresentation" – which is all the defendants offer – is no explanation at all.

Finally, the defendants note that Clarke thought "deeded access" denoted exclusive access for Tannin owners and that, in the early 1990's, he spoke with a man whose family had used the Parcel for two generations and was near tears because Gounares was suing him to stop the practice and was putting up a new fence to deny him and others access to the Parcel. Because Clarke knew from this conversation that the beach access was not used exclusively by Tannin owners, the defendants conclude the limitations period began to run at that time. (Doc. 111 at 22-23; Doc. 111-16 at 4-6, 17). The plaintiffs, however, are not suing the defendants for misrepresenting that no one else would use the Parcel but for misrepresenting that they had vested access to the Parcel; discovering the former misrepresentation could not start a limitations period as to the latter, undiscovered misrepresentation.[18]

### C.  No Misrepresentation.

A fraud claim requires a false representation. *E.g., Waddell & Reed, Inc. v.*

_____

[18] Nor does it seem possible that Clarke's awareness that a single individual had used the Parcel but that the defendants were physically and legally preventing him (and other outsiders) from doing so could start the limitations period even with respect to the former representation.

*United Investors Life Insurance Co.*, 875 So. 2d 1143, 1160 (Ala. 2003). The defendants challenge the ability of several plaintiffs to satisfy this element of their claim.

Johnson purchased his lot from the Riveras, not from the defendants. He acknowledges that the only representations he received regarding beach access were from the Riveras, not from the defendants. (Doc. 120 at 11). The defendants conclude that Johnson cannot establish that they made any representation to him. (Doc. 111 at 13-14, 26; Doc. 114 at 3). The plaintiffs agree that Johnson had no contact with the defendants or their representatives before purchasing his lot and that the "material portions of [his] individual beliefs and experiences" were conversations with Rivera, from which he developed the understanding he had deeded vehicular beach access. (Doc. 120 at 7, 11).

The plaintiffs do not argue that Rivera's representations can be attributed to the defendants.[19] Instead, they argue that the defendants made "global misrepresentations" by recording the Plat and by advertising on their website that Middle Gate was a private road extending to the Gulf. (*Id*. at 36; Doc. 123 at 7). By the plaintiffs' own admission, however, Johnson never reviewed the Plat or the website before purchasing his lot, so he could not have received any representations contained therein. *See Eady v. Southern States Ford, Inc.*, 548 So. 2d 180, 181-82 (Ala. Civ. App. 1988) (where the plaintiff conceded she did not see the sticker price, "*there was no representation made by the sticker on which she could have relied*") (emphasis in original).[20] Johnson's fraud claim therefore must fail.

---

[19] *See generally Delta Health Group, Inc. v. Stafford*, 887 So. 2d 887, 899 (Ala. 2004) ("[I]n certain limited circumstances … a plaintiff may properly state a fraud claim even though the defendant makes a false representation to a third party rather than to the plaintiff.").

[20] The plaintiffs note that, by statute, recording the Plat provided conclusive notice to all the world of everything appearing on its face. (Doc. 123 at 7). The single case on which they rely, however, says only that such notice can provide notice that a

Like Johnson, the Blacks purchased their lot from the Riveras, and the defendants argue that they made no representations to the Blacks before their purchase.  (Doc. 114 at 3).  The Blacks, however, unlike Johnson, reviewed the website before purchasing.  There they read the Declaration, which states that "Tannin is near the Gulf of Mexico and has access to it."  There they also saw an aerial shot of the area with the boundaries of the property highlighted, including the Parcel.  (Doc. 111-30 at 5; Doc. 111-40; Doc. 120-1 at 131, 134-35).

The defendants argue that nothing in these documents represented either that the Parcel was owned by the purchasers or by the Association or that the Parcel would have vehicular access.  (Doc. 114 at 4).  As has been previously discussed, the question is not who owned fee title to the Parcel but the nature of the access rights that purchasers reasonably believed they acquired.  It would appear that the Blacks could reasonably understand from the Declaration and the web photo that they were acquiring permanent beach access across the width of the Parcel; the defendants' failure to engage that proposition obviates further discussion.

The defendants assert that the only representation made to the Boyds was the correct statement that Tannin owned the Parcel.  (Doc. 114 at 4).  According to Austin Boyd's testimony, however, Gounares also told him, incorrectly, that the beach access was "part of the association," which made the decisions on whether to insure the Parcel.  (Doc. 120-1 at 50-52).

The defendants assert that the only representation made to the Schultes was the location of the Parcel and the existence of deeded beach access.  They say these representations were true because Gounares accurately identified the Parcel on the Plat and because the Grant had already been recorded.  (Doc. 114 at 4).  According to Gary Schulte's testimony, he talked to Gounares in the land office

conflicting representation is false; it in nowise suggests that a plaintiff can base a fraud claim on a representation of which he was ignorant.

and asked him where the deeded access was; Gounares brought Schulte over to the Plat and showed him the 41-foot-wide Parcel; he did not indicate that the deeded beach access extended only to a five-foot strip of the Parcel. (Doc. 111-26 at 7-10). The defendants do not explain how Gounares' general reference to the Parcel could not reasonably be construed as a representation that the deeded beach access encompassed the entire Parcel.

### D. No Reliance.

A fraud claim requires reasonable reliance on the misrepresentation. *E.g., Waddell & Reed*, 875 So. 2d at 1160. The defendants challenge most of the plaintiffs' ability to satisfy this element of their claim.

The purchase agreements executed by Clarke, the Grays and the Riveras included a merger clause reading as follows:

> Entire Agreement; No Representations. This Agreement sets forth the entire agreement between the parties, and may not be amended or modified except by written agreement of the parties. Buyer acknowledges that he has not relied on any representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, the selling agent, or otherwise, except as specifically represented in this Agreement.

(Doc. 111-34 at 4; Doc. 111-37 at 4; Doc. 111-38 at 4). The defendants argue that these plaintiffs thereby disclaimed reliance on any misrepresentation and that such a disclaimer negates reasonable reliance as a matter of law. (Doc. 111 at 24; Doc. 114 at 3). For this proposition, the defendants rely exclusively on two *Florida* cases decided in the *ILSA* context; they offer no authority for the proposition that *Alabama* considers such a disclaimer necessarily to defeat a *fraud* claim. The disconnect is fatal to their argument.[21]

---

[21] The Court notes the existence of Alabama precedent that "[a]n integration clause … is also not applicable to exclude evidence relating to a fraud claim" and that this rule extends to clauses disclaiming reliance on any representations. *Environmental Systems, Inc. v. Rexham Corp.*, 624 So. 2d 1379, 1383, 1384-85 (Ala. 1993).

The Boyds and the Schultes purchased their lots after the defendants erected the locked gate in July 2015. From this, the defendants conclude that these plaintiffs could not reasonably have relied on any representation that they would have access to the entire Parcel. (Doc. 114 at 7). The plaintiffs respond that the mere existence of the gate cannot exclude reasonable reliance; instead, the defendants must show that the Boyds and the Schultes were aware of the gate's existence before they closed, and they must also show that a reasonable person with such awareness would have realized he was not acquiring access to the entire Parcel. (Doc. 123 at 11-12).

The Court agrees with the plaintiffs. The defendants have pointed to no evidence that the Boyds or Schultes were aware of the gate when they closed, and it is difficult to see how their reasonable reliance could be destroyed by information they did not possess. Even if these plaintiffs were aware of the gate, that is not the same thing as being aware of its significance. The gate could have been erected, for example, to keep out non-Village users, with owners being provided keys, combination or other means of opening the gate when and as they desired; hunting camps and other jointly used properties commonly employ such a practice. Certainly the defendants have articulated no basis for concluding that such an understanding of the gate's significance would be unreasonable as a matter of law.[22]

The defendants protest that the burden lies with these plaintiffs to produce evidence of when they became aware of the gate and of what significance they attached to it, (Doc. 129 at 14), but that is not how summary judgment works. It is the defendants' initial burden to point to materials in the file either negating reasonable reliance or showing (as by discovery admissions) that the plaintiffs will

---

[22] Their only rationale is that, once the gate was erected, "it was obvious that no … vehicular access was possible due to the gate." (Doc. 114 at 7). As stated in text, that conclusion is far from obvious and must compete with other reasonable inferences.

be unable to present evidence establishing such reliance.  The defendants have not carried that burden and thus have passed no burden to the plaintiffs.

## VI. Breach of Fiduciary Duty.

Gounares presents a number of arguments in support of his motion for summary judgment.  Only the first is pressed against all twelve plaintiffs.

### A.  Failure to Allege Damages.

An element of a claim for breach of fiduciary duty is "damages suffered as a result of the breach."  *Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012). Gounares assert without amplification that Count Six fails to allege that any breach of fiduciary duty caused damage to the plaintiffs.  (Doc. 116-1 at 26).

"At a minimum, notice pleading requires that a complaint contain inferential allegations from which we can identify each of the material elements necessary to s sustain a recovery under some viable legal theory."  *Wilchombe v. TeeVee Toons, Inc*., 555 F.3d 949, 960 (11th Cir. 2009) (emphasis and internal quotes omitted).  Count Six does not expressly allege that the plaintiffs suffered damages as a result of Gounares' breach of fiduciary duty, but it does allege that he breached his fiduciary duty, and it demands recovery of compensatory and punitive damages.  (Doc. 1 at 17).  Gounares fails to explain why this does not constitute at least an inferential allegation that Gounares's breach of fiduciary duty caused damage to the plaintiffs.  Moreover, Count Six adopts and incorporates all preceding allegations.  (Doc. 1 at 17).  Count One expressly alleges that the defendants' conduct – which includes the conduct on which Count Six is based – caused the plaintiffs to suffer damages, including diminished property values, lost or diminished rental proceeds, and loss of use and enjoyment of their land.  (*Id*. at 14).

The plaintiffs pointed all this out in their brief, (Doc. 125 at 6-7), and Gounares in his reply offers no response.  Instead, he changes his argument from

one attacking the *pleading* of damages to one challenging the plaintiffs' *evidence* of damages. (Doc. 132 at 15). This will not do. District courts, including this one, ordinarily do not consider arguments raised for the first time on reply. *E.g., Arnold v. State Farm Fire and Casualty Co.*, 268 F. Supp. 3d 1297, 1303 (S.D. Ala. 2017). Gounares identifies no justification for withholding this argument until his reply brief, and the Court perceives none. The Court therefore will not consider his untimely argument.

### B. Lack of Fiduciary Relationship.

An element of the plaintiffs' claim is "the existence of a fiduciary duty between the parties." *Lowrey*, 101 So. 3d at 219. The existence of a fiduciary duty, in turn, depends on the existence of a fiduciary relationship. Gounares argues there can be no fiduciary relationship between himself and the Blacks, Boyds, Schultes and Johnson because those plaintiffs did not purchase lots directly from Tannin but from previous purchasers of those lots. (Doc. 116-1 at 22-24).

The plaintiffs respond that Gounares's fiduciary relationship springs from his connection with the Association and with Tannin. (Doc. 125 at 2-3). The Court shares Gounares's skepticism that his relation to Tannin could create a fiduciary relationship with the plaintiffs. Their own authority indicates that a director's fiduciary relationship extends only to the corporation and its shareholders, and the plaintiffs are not shareholders in Tannin.

The situation is different with respect to Gounares's relationship to the Association. The plaintiffs cite the Restatement (Third) of Property for the proposition that the directors and officers of a community association should be held to high standards approximating those imposed on corporate directors and private trustees (both of which are subject to fiduciary duties under Alabama law). (Doc. 125 at 2-3). Gounares in his reply fails to challenge this proposition, so the Court accepts for present purposes that Gounares's participation in the Association as a director or officer would support the existence of a fiduciary relationship.

The question thus becomes whether Gounares has met his initial burden on motion for summary judgment of showing, by reference to materials on file, either that he was not a director or officer of the Association at the relevant time or that the plaintiffs cannot present evidence at trial to prove that he was. Gounares plainly has not met this burden.

According to the defendants' evidence, Gounares was a member of the original board of directors of the Association and was its first president. (Doc. 111-30 at 34-35). In response to the plaintiffs' argument regarding the source of his fiduciary duty, Gounares filed an affidavit in which he testifies that he has not been president of the Association since May 1994. (Doc. 126-1). The affidavit negates Gounares's presidency after that date; due to its limited scope, however, it does not negate his holding of some other office, or his continued position as a director, after that date. Nor has Gounares pointed to anything in the file demonstrating that the plaintiffs will be unable to offer at trial any evidence regarding his post-1994 service as a director or officer of the Association.

Gounares in his reply brief asserts that the burden is on the plaintiffs to present evidence of a fiduciary relationship, not on him to accomplish the opposite. Because the plaintiffs have not presented evidence regarding his role relative to the Association since May 1994, he claims victory. (Doc. 132 at 11). As discussed above, Gounares misunderstands his burden on motion for summary judgment; while the plaintiffs cannot advance to a jury if at trial they do not present evidence supporting the existence of a fiduciary relationship, on motion for summary judgment the plaintiffs bear no burden at all until and unless Gounares first carries his threshold burden. As discussed above, he has not done so.[23]

---

[23] The Court further notes that Gounares in his reply brief improperly, and ineffectually, purports to expand his argument to encompass all the plaintiffs. (Doc. 132 at 9-11).

### C. Lack of Standing.

Gounares presents evidence that Johnson has been in arrears for several years in payment of his Association dues. Gounares asserts that, as a result, Johnson's "right to use the beach access has been suspended" and concludes that Johnson thus lacks standing to pursue his claim against Gounares. (Doc. 116-1 at 24).

For the proposition that Johnson's right to use the Parcel has been suspended, Gounares cites the Declaration. That document provides only that the Association "shall have the *right* to … suspend the … right to use of the Commons by an Owner for any period during which any Assessment against his Lot remains unpaid." (Doc. 111-30 at 21 (emphasis added)). Gounares has thus presented evidence that Johnson is subject to suspension, but he has presented no evidence that Johnson has in fact been suspended. Without such evidence, his argument necessarily fails.

### D. Lack of Breach.

Gounares next argues that Clarke and the Grays have no evidence that he breached any fiduciary duty owed them. (Doc. 116-1 at 24-25). He bases this argument on the misapprehension that the plaintiffs' claim rests solely on representations made to them before closing on their respective lots. According to the plaintiffs, however, their claim is also based, *inter alia*, on Gounares's repeated statements to the Association that Tannin's record ownership of the Parcel was just an oversight that he would correct. (Doc. 125 at 4). In his reply, Gounares asserts that this and all aspects of the claim are barred by the statute of limitations. (Doc. 132 at 12-13). Once again, the Court will not consider a new argument raised for the first time in reply.[24]

---

[24] Gounares does not claim to have been justifiably ignorant of the basis of the plaintiffs' claim and thus unable to properly prepare his motion for summary judgment,

### E. Lack of Lot Ownership.

Count Six alleges that Gounares owes fiduciary duties "to all lot owners" in the Village. (Doc. 1 at 17). The Riveras and the Blacks sold their last lots in 2017. Gounares concludes that these plaintiffs are no longer "lot owners" and thus no longer persons to whom Gounares owes any fiduciary duty. (Doc. 116-1 at 25-26).

The Court agrees with the plaintiffs, (Doc. 120 at 5-6), that this argument holds no water. The Riveras and Blacks were lot owners when the conduct made the basis of the claim occurred, and they were still lot owners when this lawsuit was filed. The mere fact that they subsequently sold their lots does not defeat their claim any more than a motorist's sale of his car would defeat his claim for injuries suffered in an accident.

### F. Lack of Damages.

Gounares presents evidence that the Blacks pursue their claim only with respect to the lot they purchased after the locked gate was installed in July 2015. Gounares assumes rather than demonstrates that the Blacks (for reasons he does not articulate) cannot succeed on such a claim. (Doc. 116-1 at 26-27). The Court will not search on Gounares's behalf for a rationale to support his bald conclusion.

---

and the copious references in the record to his statements at Association meetings, and to his other alleged representations, would render any such claim untenable.

For the same reason, the Court will not consider Gounares's tardy injection of a "business judgment" defense in his reply brief. (Doc. 132 at 14-15). The Court similarly disapproves of Gounares's effort in his reply brief to expand his no-breach argument to encompass all twelve plaintiffs.

## CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment as to Counts One, Two, Three and Five are **granted**. Their motions for summary judgment as to Count Four are **granted** with respect to Johnson and are otherwise **denied**. Gounares's motion for summary judgment as to Count Six is **denied**.

DONE and ORDERED this 14th day of March, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE